856 So.2d 1 (2003)
RAFAEL J. ROCA, P.A., a Florida professional association, Appellant,
v.
LYTAL & REITER, CLARK, ROCA, FOUNTAIN & WILLIAMS, a Florida general partnership, Lake Lytal, Jr., Joseph J. Reiter, Mark W. Clark, Donald R. Fountain, Jr., and William S. Williams, Individually, Appellees.
No. 4D01-3795.
District Court of Appeal of Florida, Fourth District.
July 9, 2003.
Rehearing Denied October 30, 2003.
Philip M. Burlington of Caruso, Burlington, Bohn & Compiani, P.A., West Palm *2 Beach, and Steven M. Katzman of Katzman, Wasserman & Bennardini, P.A., Boca Raton, for appellant.
Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, and Gerald Richman of Richman, Greer, Weil, Brumbaugh, Mirabito & Christensen, P.A., West Palm Beach, for appellees.
PER CURIAM.
In this case, a jury was asked to determine whether Rafael J. Roca, P.A. ("Roca"), was a partner in the law firm of Lytal, Reiter, Clark, Roca, Fountain and Williams from January 1, 1997, through February 16, 1998. The jury found that Roca was a partner during the relevant time period. Thereafter, the trial judge granted the appellees' motion for judgment notwithstanding the verdict and for entry of judgment in accordance with the motion for directed verdict, set aside the jury's verdict, and entered judgment in favor of the defendants. We reverse and direct the trial court to reinstate the jury's verdict.

I. The Evidence at Trial
It was undisputed that in September of 1995, the law firm of Lytal & Reiter announced that Rafael J. Roca, Donald Fountain and William Williams would be partners in the law firm and that the name of the firm would change to Lytal, Reiter, Clark, Sharpe,[1] Roca, Fountain and Williams. This new partnership was formed pursuant to an oral agreement and, under the terms of that agreement, Lake Lytal, Jr., and Joseph J. Reiter were to retain sixty-five percent and the remaining partners were to share thirty-five percent. It was left to Clark, Sharpe, Roca, Fountain and Williams to reach an agreement on how to split the thirty-five percent. The five, however, were never able to form a consensus on this issue. At this point, the parties begin to disagree about what happened and the significance of events. Because we are reviewing a directed verdict, we must assess the evidence and all inferences of fact in a light most favorable to appellant, the nonmoving party. See Frenz Enters., Inc. v. Port Everglades, 746 So.2d 498 (Fla. 4th DCA 1999).

A. 1996 and the Events Leading up to the December 1996 Withdrawal Agreement
First, while Roca testified that the thirty-five percent that he and the others were to split represented a percentage of ownership in the firm, Lake Lytal, Jr., and Joseph Reiter maintained that the thirty-five percent was merely thirty-five percent of the firm's income. Despite the lack of agreement regarding how to divvy up the thirty-five percent, Roca's name and the names of the others were added to the door. Additionally, Roca testified that he and the others began to participate in partnership meetings. According to Roca, in 1996, he was paid a percentage of the 1996 profits, and not a salary and bonus, as had been the case in prior years.
During the efforts to reduce the oral partnership agreement to writing, conflict arose over whether the new partners would be required to buy into the partnership and whether the new partners would be subject to a vesting period. Roca testified that the new partners' rejection of the vesting period caused conflict with Sharpe and Clark, who felt that since they had been there longer and had been subject to a vesting period, any new partners should *3 also be subject to a vesting period. Eventually, due to the conflict, Sharpe was asked to leave the firm. After Sharpe was asked to leave, Lytal and Reiter announced that they would determine how much of the thirty-five percent each of the remaining partners would receive, assigning Clark ten percent, Fountain and Roca eight percent each, and Williams five percent, leaving sixty-nine percent for Lytal and Reiter to split between them.
Then, in December of 1996, all of the new partners were asked to sign a withdrawal agreement. Lytal testified that after Sharpe was asked to leave, they realized that he could force the dissolution of the partnership and that the purpose of the 1996 withdrawal agreement was to "get out of" the oral partnership. According to Roca, when he went to Reiter's office to collect his check for his share of the 1996 profits, Reiter pulled out the withdrawal agreement and told him not to worry because they were going to continue as before and his share of the profits would be eight percent. Lytal testified that it was promised that if Roca and the others signed the agreement, when things with Sharpe were resolved, a new written agreement would be reached. Clark, Roca, Fountain and Williams each signed a withdrawal agreement.[2] Sharpe refused.

B. 1997
For his part, Roca testified that, following the December 1996 withdrawal agreement, there was a new oral partnership agreement whereby he would receive eight percent of the firm's profits. According to Roca, the oral partnership, in 1997 and early 1998, was Lytal, Reiter, Clark, Roca, Fountain and Williams, i.e., a firm without Sharpe. And, at trial, Roca testified that, following the signing of the December 1996 withdrawal agreement, he had a conversation with Lytal, wherein Lytal indicated that they were forming a new partnership that would not include Sharpe. Lytal and Reiter denied ever telling Roca that, in the face of the 1996 withdrawal agreement, they were forming a new oral partnership without Sharpe.
In any event, what both Roca and Lytal and Reiter agree upon is that, in 1997 and following the withdrawal agreement, anyone looking would have believed that Roca and the others were partners. As evidence of the new partnership, Roca cited (1) an August 1997 partnership meeting wherein Lytal encouraged the new partners, including Roca, to assign more of their cases to associates because all of the money was going into the same pot for the *4 partners; (2) the firm's phone book listing, "Lytal, Reiter, Clark, Roca, Fountain, and Williams"; (3) a July 1997 press release referring to Roca as a partner in the firm of Lytal, Reiter, Clark, Roca, Fountain and Williams; and (4) an October 1997 letter that Joseph Reiter wrote to Justice Anstead referring to Roca as a partner.
Roca also presented evidence that he, and the other individual appellees, signed the settlement papers for the litigation that resulted when Sharpe left the firm, personally guaranteeing a $1.2 million loan taken out by the firm. Additionally, Roca testified that, in 1997, he received a share of the firm's profits and that a capital account was established in his name with a balance of approximately $70,000, representing the amount that the firm was unable to pay at the time.[3] The firm's accountant later testified that any designation of a capital account for Roca by the firm's bookkeeper had been in error.
Lytal and Reiter explained away the significance of their treating Roca and the others as partners following the December 1996 withdrawal agreements as simply the fulfillment of a commitment on their part to save their colleagues any embarrassment or humiliation until a new, written partnership agreement could be reached.

C. 1998
In February of 1998, Roca resigned from the firm after reviewing financial documents that led him to believe that Lytal and Reiter were not splitting the firm's profits fairly. In March of 1998, Lytal, Reiter, Clark, Fountain and Williams signed a new partnership agreement. That same month, Roca sued the partnership and each of the men individually.

II. The Jury's Verdict and the Trial Judge's Determination that the Verdict could not Stand
By its verdict, the jury necessarily concluded that subsequent to the signing of the withdrawal agreements, a new partnership was formed between Lytal, Reiter, Clark, Roca, Fountain and Williams in 1997 continuing to 1998. In setting aside the jury's verdict, the judge found that, by its express terms, the December 1996 withdrawal agreement precluded the formation of a subsequent oral partnership among the parties. Further, the judge found that any attempt to form a partnership by oral agreement failed as a matter of law because there was no "meeting of the minds" and the agreement lacked essential terms. We conclude that the trial court erred in each of these determinations.

A. The Jury's Findings
Florida's Revised Uniform Partnership Act, which became effective January 1, 1996, defines a "partnership" as "the association of two or more persons to carry on as coowners a business for profit" and specifically provides that such an association results in a "partnership" "whether or not the persons intend to form a partnership." § 620.8202(1), Fla. Stat. In other words, formation of a partnership does not require a showing that the parties subjectively intended to create a partnership, only that they intended to do the things that constitute a partnership. See 18 pt. 2, Fla. Stat. Ann. 287-88, cmt. 1; Everett v. Ribicoff, 200 F.Supp. 103, 111 (N.D.Fla. 1961). With these principles in mind, we *5 find that there was competent substantial evidence in the record to sustain the jury's finding that Roca was a partner in Lytal, Reiter, Clark, Roca, Fountain and Williams in 1997 and early 1998.

B. The Trial Judge's Legal Rulings
Having found that the jury's factual determination of partnership is sustainable, we next consider whether any of the legal reasons cited by the trial judge support his decision to set aside the verdict. First, the judge found that the express terms of the December 1996 withdrawal agreement provided that Roca was withdrawing from the partnership and that he would not thereafter be a partner absent a further written agreement. Here, we believe that the trial judge interpreted the agreement too broadly. On its face, the agreement provides only that Roca is withdrawing from the firm of Lytal, Reiter, Clark, Sharpe, Roca, Fountain and Williams and will not re-enter Lytal, Reiter, Clark, Sharpe, Roca, Fountain and Williams without a written agreement. The document says nothing about Roca entering into any other partnerships, i.e., a partnership without Sharpe.
At worst, the agreement is ambiguous as to the formation of any partnership without Sharpe. In the face of ambiguity on this issue, the jury was free to look to the subsequent conduct of the parties to ascertain the parties' intent and the agreement's meaning. Where an agreement is ambiguous, the meaning of the agreement may be ascertained by looking to the interpretation that the parties have given the agreement and the parties' conduct throughout their course of dealings. See, e.g., Mayflower Corp. v. Davis, 655 So.2d 1134, 1137 (Fla. 1st DCA 1994). There was ample evidence that, following the December 1996 withdrawal agreement, while Clark, Roca, Fountain and Williams were treated as partners by Lytal and Reiter, Sharpe was not so treated. Thus, based on the parties' own actions, the jury could have concluded that the December 1996 withdrawal agreement served only to preclude the reformation of a partnership including Lytal, Reiter, Clark, Sharpe, Roca, Fountain and Williams absent a written agreement. Accordingly, the parties' subsequent conduct and course of dealings would not have been in conflict with the express terms of the 1996 withdrawal agreement.
Next, we turn to the judge's findings that the alleged oral partnership agreement did not "rise to the level of a binding contract" because (1) there was no testimony that Roca had conversations concerning the oral partnership with Reiter, Clark, Fountain or Williams and (2) the terms of the oral partnership agreement were lacking in "definiteness and certainty." As for the first of these grounds, Roca was not required to testify that he spoke with each of the partners in order for there to be a partnership. Florida law provides that a partnership results from either an express or implied agreement to share profits and to carry on the business as co-owners. See In re Porton, 30 B.R. 374, 376 (Bankr.M.D.Fla.1983)("It is a general principle of law that as between the parties to an alleged partnership, the existence of a true partnership relation depends on an agreement, whether implied or express, to operate as such.")(citing A.J. Richey Corp. v. Garvey, 132 Fla. 602, 182 So. 216 (1938)); Greiner v. Gen. Elec. Credit Corp., 215 So.2d 61, 63 (Fla. 4th DCA 1968).
We likewise reject the judge's finding that any oral partnership agreement was not sufficiently definite to be enforceable. To support his finding on this issue, the trial judge relies upon Dreyfuss v. Dreyfuss, 701 So.2d 437 (Fla. 3d DCA 1997). Dreyfuss involved a dispute between a father and a son. The son was an attorney *6 who occasionally did legal work for his father's business, Brickell Earth Station, Inc., a company that obtained cable television contracts with condominium associations. When the son's employment was terminated, the father invited the son to do a sales presentation for his company. According to the son, on the way home from the presentation, the father offered to pay him a percentage of the company's future revenues if, in exchange, the son would give up his right to hourly compensation for legal services rendered to the company, forgive any outstanding debt for services rendered, and join his father as a salesman. At trial, however, the son also testified that he could not recall if any of the terms regarding the sharing of profits and losses were discussed.
The father testified that there never was an agreement to form a partnership and share equally in the profits. The father further stated that he had never split the business's profits with his son, but, instead, had paid him a share of gross revenues for the time that the son spent obtaining contracts and providing legal services. On these facts, the Third District held that the essential terms of a partnership had not been established, citing the following deficiencies: (1) the son was unsure of whether his agreement was with his father as an individual or with the corporation; (2) the son was unsure of the duration of the agreement; (3) the son could not recall the financial specifics of the arrangement; and (4) there was no discussion regarding how to dissolve the partnership. See Dreyfuss, 701 So.2d at 439-40.
In contrast to Dreyfuss, here, there was evidence on the manner in which the profits would be divided. Additionally, unlike Dreyfuss, here, the one claiming the existence of the partnership, Roca, testified that he also agreed to share partnership losses and be responsible for partnership debts. See § 620.8401(2), Fla. Stat. (providing that, absent an agreement to the contrary, losses will be shared in the same manner as profits). And, finally, the provisions of Florida's Revised Uniform Partnership Act specifically allow for a "partnership at will," i.e., one in which "the partners have not agreed to remain partners until the expiration of a definite term or the completion of a particular undertaking," see § 620.8101(9), Fla. Stat., and provide default provisions for dissolution and winding up, see §§ 620.8801-.8807, Fla. Stat.
In sum, we find that none of the reasons cited by the trial court justified setting aside the jury's verdict, and doing so was legal error as well as a clear abuse of discretion. Consequently, we reverse the order setting aside the verdict, direct the trial court to reinstate the jury's verdict, and remand the case for further proceedings.
REVERSED and REMANDED.
KLEIN, STEVENSON, JJ., and BAILEY, JENNIFER D., Associate Judge, concur.
NOTES
[1] Mark Clark and Tracy Sharpe were already partners in the firm, although their names had not been on the door.
[2] Roca's December 1996 withdrawal agreement provided in relevant part:

AGREEMENT made this 20 day of December, 1996, by and among RAFAEL J. ROCA, P.A. ("Roca"), LAKE LYTAL, JR., P.A. ("Lytal"), JOSEPH J. REITER, P.A. ("Reiter") and LYTAL, REITER, CLARK, SHARPE, ROCA, FOUNTAIN, AND WILLIAMS (f/k/a Lytal and Reiter), a Florida general partnership ("Partnership").
WHEREAS, the parties hereto are now desirous of resolving the 1996 division of Partnership profits as well as uncertainties and any differences which have arisen as the result of such negotiations:
NOW, THEREFORE, it is agreed as follows:
4. Roca hereby withdraws as an Income Partner from the Partnership, effective as of the date hereof. Notwithstanding the foregoing, the parties shall continue to negotiate in good faith as to the terms of the revised Partnership Agreement, substantially in the form of the Restated Draft except that if such Restated Draft shall be ultimately agreed to and consummated, Roca's entitlement to profits shall be Eight percent (8%). If such Restated Draft shall not ultimately be executed by the parties hereto, then Roca's withdrawal as a Partner hereof shall remain effective as of the date hereof and he shall not thereafter reenter the Partnership as a Partner.
[3] A capital account is defined as "`[a] term used in accounting to describe the equity in a business. In a partnership, each partner has a capital account which represents his contribution or investment in the partnership.'" Cadle Co. v. G & G Assocs., 757 So.2d 1278, 1279 n. 2 (Fla. 4th DCA 2000)(quoting BLACK'S LAW DICTIONARY 209 (6th ed.1990)).